UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| FEDERICO DIAZ GARCIA,<br><br>    Petitioner,<br><br>v.<br><br>KRISTI NOEM, et al.,<br><br>    Respondents. | No. 1:25-CV-247-H |

# ORDER

Before the Court is Federico Diaz Garcia's motion for a temporary restraining order and preliminary injunction (Dkt. No. 3) and brief in support (Dkt. No. 4). Diaz Garcia alleges that his detention without bond, pursuant to recent Board of Immigration Appeals precedent, violates the Immigration and Nationality Act and his constitutional right to due process of law. Dkt. No. 4 at 11–12. Specifically, he contends that the INA "does not require his mandatory detention" because he "entered the country illegally 15 years ago [and] was obviously not applying for admission." *Id.* at 14. But this argument flatly contradicts the statute's plain language and the history of legislative changes enacted by Congress. Thus, Diaz Garcia fails to meet the high bar for emergency relief, and the Court denies the motion.

1. **Background**

Diaz Garcia is a Mexican citizen who illegally entered the United States approximately 15 years ago. *Id.* In October 2025, the respondents apprehended him inside the United States and placed him in removal proceedings before an Immigration Judge (IJ). *Id.* The respondents issued him a Notice to Appear, alleging that he "entered the country without admission or parole," and the respondents continue to detain him without bond at

the Bluebonnet Detention Center in Anson, Texas.  Dkt. Nos. 1 at 11; 4 at 11.  As of the filing of his petition, he has been detained for three weeks.  *See id.*  Diaz Garcia seeks a TRO and a preliminary injunction "prohibiting the Respondents from continuing to detain him pending the resolution of his Writ of Habeas Corpus and to order that he be released."  Dkt. No. 4 at 25.  Alternatively, Diaz Garcia asks the Court to find that he is eligible for a bond hearing under 8 U.S.C. § 1226(a) and to order the respondents to hold a bond hearing "without delay."  *Id.*

2.     **Legal Standards**

Federal Rule of Civil Procedure 65 governs the issuance of injunctions and TROs.  Rule 65(a)(1) provides that "[t]he [C]ourt may issue a preliminary injunction only on notice to the adverse party."  Under Rule 65(b), however, the Court may issue a TRO without notice if the moving party satisfies two requirements.  First, the moving party must present "specific facts in an affidavit or a verified complaint" clearly demonstrating "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A).  Second, the moving party's attorney must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1)(B).

Additionally, a party seeking both a TRO and preliminary injunctive relief must satisfy the four-factor standard for obtaining a preliminary injunction.  *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 644–45 (N.D. Tex. 2021).  That standard requires the party seeking relief to establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that the issuance of the preliminary injunction will not disserve the

public interest. *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013). "[I]f a party fails to meet *any* of the four requirements, the court cannot grant the TRO or preliminary injunction." *Speed v. America's Wholesale Lender*, No. 3:14-CV-3425, 2014 WL 4755485, at *1 (N.D. Tex. Sept. 24, 2014) (emphasis in original); *Clark v. Prichard*, 812 F.3d 991, 993 (5th Cir. 1987) (explaining that "[t]he party seeking such relief must satisfy a cumulative burden of proving each of the four elements").

3.  Analysis

Diaz Garcia fails to demonstrate a substantial likelihood of success on the merits, which is fatal to his motion for a TRO and preliminary injunction. The Court recognizes, however, that it is issuing this Order under the accelerated timeframe of a motion for emergency relief. The Court has not yet had the benefit of the government's response to the petition or the petitioner's reply. The Court will, of course, consider and finally resolve Diaz Garcia's petition (Dkt. No. 1) only after it has the benefit of full briefing.

A.  **The text of the INA weighs heavily against Diaz Garcia's position.**

First, Diaz Garcia misapprehends the relevant statutory term when he argues that the INA's mandatory-detention provision applies to arriving aliens "encountered at ports of entry who lack documentation to be admitted into the country." Dkt. No. 4 at 14. The mandatory-detention provision applies to "applicants for admission," not merely arriving aliens. 8 U.S.C. § 1225(b).[1] To be sure, an arriving alien is an applicant for admission: Subsection 1225(a)(1) defines applicant for admission, in part, as "[a]n alien . . . who arrives in the United States." But the same provision also defines an applicant for admission as

---

[1] While Section 1226(c) also mandates detention for certain classes of aliens, this order refers to Sections 1225 and 1226 as the mandatory- and discretionary-detention provisions, respectively, for the sake of simplicity.

3

"[a]n alien present in the United States who has not been admitted." *Id.* This is not the most intuitive definition of the term, but it is the one that Congress enacted into law. And although courts generally construe statutory terms according to their ordinary meaning, "'[w]hen a statute includes an explicit definition, [the Court] must follow that definition,' even if it varies from a term's ordinary meaning." *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008)). Thus, given that Diaz Garcia is "[a]n alien present . . . who has not been admitted," the plain language of the mandatory-detention provision weighs heavily against his assertion that he is subject only to discretionary detention. § 1225(a)(1); *see also Garibay-Robledo v. Noem*, No. 1:25-cv-177, Dkt. No. 9 at *4–6 (N.D. Tex. Oct. 24, 2025) (denying reconsideration of a TRO because the petitioner was an applicant for admission under the mandatory-detention provision); *Montoya Cabanas v. Bondi*, No. 4:25-cv-4830, 2025 WL 3171331, at *4–6 (S.D. Tex. Nov. 13, 2025) (adopting the reasoning of *Garibay-Robledo* in denying a habeas petition).

  The Executive Office of Immigration Review's (EOIR) regulations, which were drafted following the Illegal Immigration Reform and Immigration Responsibility Act of 1996's (IIRIRA) enactment, confirm this understanding of the term "applicants for admission." One such regulation provides that "*[d]espite being applicants for admission*, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination." *Inspection and Expedited Removal of Aliens*, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) (emphasis added). This regulation explains that "[t]he effect of this change is that inadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge, while arriving aliens do not." *Id.* The clear implication of this language is that, despite possessing the authority to deny bond

4

to broad classes of aliens, the government previously declined to exercise the full extent of its authority under the INA.

But in July 2025 DHS issued a notice titled "Interim Guidance Regarding Detention Authority for Applicants for Admission." *See Vazquez v. Feeley*, No. 2:25-CV-1542, 2025 WL 2676082, at *5 (D. Nev. Sept. 17, 2025) (describing the leaked DHS notice and noting that the government did not object to its authenticity). This notice advised that "section 235 of the [INA], rather than section 236"—that is, the mandatory-detention provision, not the discretionary-detention provision—"is the applicable immigration detention authority for all applicants for admission." *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, AILA Doc. No. 25071607, Am. Immigr. Laws. Ass'n (July 8, 2025).[2] The BIA adopted this broader application of the mandatory-detention provision in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). The BIA acknowledged that "for years [IJs] have conducted bond hearings for aliens who entered the United States without inspection," but they did "not recall either DHS or its predecessor, the Immigration and Naturalization Service," ever challenging that practice. *Id.* at 225 n.6.

### B. The statutory history of the INA supports the Court's interpretation of the mandatory-detention provision.

"Statutory history, 'the record of enacted changes Congress made to the relevant statutory text over time,' can also provide helpful context" for interpreting statutory language. *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (quoting *BNSF Ry. Co. v. Coos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (emphasis omitted)). And the

---

[2] https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission [https://perma.cc/5GKM-JYGX].

statutory history of the INA confirms the Court's interpretation of the term "applicants for admission."

By enacting the IIRIRA, Congress sought to replace the so-called entry doctrine, in which the manner of immigration proceedings turned on whether an alien had entered the country, with a process based on admission. *See Martinez v. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012) ("Prior to the [IIRIRA], the INA assessed status on the basis of 'entry' as opposed to 'admission.'"). Under the entry doctrine, an alien who had entered the United States was entitled to greater procedural protections, including a deportation hearing. *Id.* The result was a system that rewarded aliens who illegally entered the country with greater procedural protections than those who properly applied for admission at the border.

Thus, the IIRIRA amended the INA to make admission, not entry, the relevant criterion for removal procedures. *Id.* The INA defines admission as "the *lawful* entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A) (emphasis added). By defining "applicants for admission" broadly enough to encompass both arriving aliens and illegal entrants, Congress removed the previously existing incentives to enter the country illegally.

C.   **Diaz Garcia's remaining arguments are not persuasive.**

Although Diaz Garcia argues that he "has a clear right" to a bond hearing, Dkt. No. 4 at 13, his appeal to the statutory text is strikingly thin. His only argument that he does not qualify as an "applicant for admission" is that he entered illegally 15 years ago and thus "obviously . . . was not seeking admission into the United States." *Id.* at 14 (internal quotation marks omitted). But, first, this argument improperly conflates entry with

6

admission, thus collapsing the exact distinction IIRIRA sought to introduce through its expansive definition of "applicants for admission." *See supra* Analysis § 3(B).

Second, the way that the INA uses the term "seeking admission" illustrates that it is merely a corresponding gerund phrase for "applicant for admission." Subsection 1225(a)(3) provides that "[a]ll aliens . . . [w]ho are applicants for admission *or otherwise seeking admission* . . . shall be inspected." (emphasis added). Subsection 1225(a)(5) states that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant *in seeking admission* to the United States." (emphasis added). The logical import of this phrasing is that one who is an applicant for admission is considered to be "seeking admission" under the statute.

Diaz Garcia cites a handful of cases that attempted to distinguish an "applicant for admission" from an alien "seeking admission." Dkt. No. 4 at 14–15. But this distinction places form over substance. There is no material disjunction—by the terms of the statute or the English language—between the concept of "applying" for something and "seeking" something. Black's Law Dictionary defines "applicant" as "[s]omeone who requests something; a petitioner, such as a person who applies for letters of administration." (12th ed. 2024). Thus, an applicant for admission, in ordinary English usage, is one who requests (or seeks) something. Insofar as the term "applicant for admission" is more passive than "seeking admission," this is inherent in the nature of agent nouns and their corresponding gerunds.

Finally, Diaz Garcia argues that his reading of the INA is bolstered by legislative history, the recent passage of the Laken Riley Act, and various dicta from a Supreme Court

7

opinion and oral argument. *See* Dkt. No. 4 at 15–16. "But legislative history is not the law, nor can it muddy clear statutory language." *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 676 (5th Cir. 2024) (citation modified). And the Supreme Court's dicta in *Jennings* recognizing that Section 1226 "applies to aliens already in the United States" hardly means the same cannot be said of Section 1225, and it certainly does not negate the clear statutory definition of "applicants for admission" in Section 1225. Dkt. No. 4 at 16 (citing *Jennings*, 583 U.S. at 303).

The Court recognizes, however, that many courts have concluded that this broader interpretation of the mandatory-detention provision renders certain subsections of Section 1226 superfluous. But this argument, standing alone, is an insufficient basis to depart from the clear text of the statute. The Supreme Court "has often recognized [that] '[s]ometimes the better overall reading of [a] statute contains some redundancy.'" *Barton v. Barr*, 590 U.S. 222, 239 (2020) (quoting *Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019)). More to the point, "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." *Id.* Indeed, the canons of statutory construction should only "be used to resolve remaining ambiguity," not to inject it where it does not exist. *Moore*, 71 F.4th at 395.

D.  **Garcia's administrative retroactivity argument is unpersuasive.**

Next, Diaz Garcia contends that *Yajure Hurtado*—the BIA's recent, broader application of the mandatory-detention provision—should not apply retroactively to individuals in his position. Dkt. No. 4 at 19–20. In *Monteon-Camargo v. Barr*, the Fifth Circuit held that, when a court decides whether to apply retroactively a case of first impression, the court must "balance the ills of retroactivity against the disadvantages of

8

prospectivity." 918 F.3d 423, 430 (5th Cir. 2019) (internal alteration omitted) (quoting *Microcomputer Tech. Inst. v. Riley*, 139 F.3d 1044, 1050 (5th Cir. 1998)). "If that mischief [of prospectivity] is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

First, for the reasons stated above, the Court is unpersuaded that *Yajure Hurtado* implicates retroactivity concerns at all, because the INA's clear text has always permitted mandatory detention for aliens in Diaz Garcia's position. *See supra* Analysis § 3(A) (describing EOIR's implementing regulations). At this early stage, the Court finds it plausible that the government's reading of the INA could have been prospective from the start.

But even assuming *Yajure Hurtado* does implicate retroactivity concerns, Diaz Garcia's argument still fails. A few district courts have found that retroactive application of *Yajure Hurtado*'s no-bond rule is impermissible where the petitioner has already been subject to prior proceedings or released on recognizance. *Chavez v. Dir. of Detroit Field Office*, No. 4:25-CV-2061, 2025 WL 2959617, at *8 (N.D. Ohio Oct. 20, 2025) (barring retroactive application where proceedings had begun); *Lopez-Arevelo v. Ripa*, ___ F. Supp. 3d ___, No. EP-25-CV-337, 2025 WL 2691828, at *10–11 (W.D. Tex. Sept. 22, 2025) (explaining that procedural due process interests were created because the petitioner had previously been released on recognizance). But ICE implemented its new policy to deny bond in July 2025, and the BIA issued its decision in *Yajure Hurtado* in early September 2025. Yet Diaz Garcia remained in the country, in violation of federal law, until his arrest on October 22, 2025. Dkt. No. 4 at 11. Because "[b]eing found in the United States illegally is a continuing

9

offense that . . . continues until the defendant is found," *United States v. Hernandez-Flores*, 460 F. App'x 434, 435 (5th Cir. 2012) (citing *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996)), the Court is unpersuaded that Diaz Garcia's detention without bond implicates retroactivity concerns.

**4.     Conclusion**

In light of the above facts and authorities, the Court denies Diaz Garcia's motion for a TRO and a preliminary injunction (Dkt. No. 3). He fails to carry his burden to show a significant likelihood of success on the merits. Diaz Garcia's habeas petition (Dkt. No. 1) remains pending.

So ordered on November 18, 2025.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE